**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

WILLIE MACON,

      Plaintiff,

vs.                                                                                    CASE NO.:

ADR 20 LLC
Florida Limited Liability Company                       INJUNCTIVE RELIEF SOUGHT
d/b/a THE CORNER PIZZA BAR

      Defendant(s).

**<u>COMPLAINT</u>**

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues ADR 20 LLC, Florida Limited Liability Company, d/b/a  THE CORNER PIZZA BAR ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1

1.     This action arises from Defendant's failure to make Defendant's online platform located at www.thecornerpizzabar.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2.     MACON files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3.     Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## **JURISDICTION AND VENUE**

4.     This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5.     Venue is proper in this Court, Orlando Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Orange County, Florida.

6.      Defendant attempts to and indeed does, participate in Orange County's economic life by offering and providing products and services over the internet to Orange County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7.      Further, Defendant operates a Principal Place of Business with a physical address of 150 S Magnolia Ave #101E, Orlando, Florida    32801 (hereinafter "Defendant's Principal Place of Business"), which is located in Orange County, Florida.

8.      MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9.      MACON is a natural person over the age of 18 and is blind.

3

10.    MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11.    MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12.    MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an

4

> arrow symbol to a hand. The screen reading software uses auditory --
> rather than visual -- cues to relay this same information. When a sight
> impaired individual reaches a link that may be 'clicked on,' the
> software reads the link to the user, and after reading the text of the link
> says the word 'clickable.'...Through a series of auditory cues read aloud
> by the screen reader, the visually impaired user can navigate a website
> by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.    MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14.    MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15.    Defendant is a Florida Limited Liability Company with a principal place of business of 150 S Magnolia Ave #101E, Orlando, Florida      32801 (hereinafter "Defendant's Principal Place of Business").

16.    Defendant's Website is an online platform operated by Defendant that promotes Defendant's pizza bar and italian restaurant and allows customers to interact with Defendant's Principal Place of Business digitally. Through Defendant's Website, users can view menus, place online orders, make reservations,

purchase gift cards, enroll in a loyalty program, and submit catering or party requests. Defendant's Website is closely integrated with Defendant's in-person dining operations at Defendant's Principal Place of Business, providing customers with information about offerings, pricing, and services available at Defendant's Principal Place of Business. Defendant's Website functions as a primary point of access for customers seeking to engage with Defendant's goods and services, both remotely and in connection with visiting Defendant's Principal Place of Business. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. There is a clear nexus between Defendant's Website and Defendant's Principal Place of Business because Defendant's Website is not merely informational but is directly integrated with and facilitates access to the goods and

services offered at Defendant's Principal Place of Business. Specifically, Defendant's Website allows customers to place orders for food to be prepared and fulfilled at Defendant's Principal Place of Business, join Defendant's loyalty program, purchase gift cards redeemable at Defendant's Principal Place of Business, and arrange catering and event services hosted or serviced through Defendant's Principal Place of Business. In this way, Defendant's Website operates as a gateway through which customers can access, arrange, and complete transactions for the same goods and services provided at Defendant's Principal Place of Business, thereby creating a direct and substantial connection between Defendant's Website and Defendant's Principal Place of Business.

20.    At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.    MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22.    There is a direct nexus between Defendant's Website and Defendant's Principal Place of Business because Defendant's Website functions as an extension of Defendant's Principal Place of Business. Through Defendant's Website, customers can view menus, place online orders for pickup or service fulfilled at Defendant's Principal Place of Business, purchase gift cards for use at Defendant's Principal place of Business, and arrange catering or private events connected to that location. Defendant's Website is therefore not merely informational, but actively facilitates and promotes the goods and services offered at Defendant's Principal Place of Business, creating a clear and substantial connection between Defendant's Website and Defendant's Principal Place of Business.

23.    Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24.    The opportunity to search and utilize Defendant's Website, including accessing information about Defendant's goods and services, viewing menus,

8

placing orders, and signing up for electronic communications to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business, from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often difficult, hazardous, frightening, frustrating, and confusing. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software, thereby limiting MACON's ability to independently access and engage with Defendant's Website and the goods and services offered at Defendant's Principal Place of Business.

25.     Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26.     MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27.     On or about the following dates, MACON attempted to utilize Defendant's Website:

a.     March 02, 2026;

b.     March 12, 2026;

9

    c.        March 27, 2026; and

    d.        March 31, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28.    While notice to Defendant is not required, MACON sent a pre-suit communication on March 12, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29.    Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30.    However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

10

31.    MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32.    On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements.  The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33.    Congress found, among other things, that:

a.    some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b.    historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c.    discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

11

d.    individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e.    the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34.    Congress explicitly stated that the purpose of the ADA was to:

a.    provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b.    provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c.    invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order

12

to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35.    Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36.    "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

37.    More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38.    Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39.    The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

---

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 8.

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

14

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, operating hours, and access to products found at Defendant's Principal Place of Business and address to Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business providing customers with the ability to view menus, place online orders for pickup or fulfillment at Defendant's Principal Place of Business, purchase gift cards redeemable at Defendant's Principal Place of Business, enroll in loyalty programs tied to purchases made at Defendant's Principal Place of Business, and arrange catering and event services connected to Defendant's Principal Place of Business, thereby directly linking the goods and services offered online to those available at Defendant's Principal Place of Business.

15

43.  Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44.  The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45.  Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46.  Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47.  Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or

accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48.    According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.    Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of

17

making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50.    MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a.    **Heading Elements Incorrectly Used in the Header Section**

18

i.  **Issue:** The page header section contains a heading level that does not appropriately represent the main title or serve as a section heading for the page's content. Headings should delineate significant sections and aid users in comprehending the page's structure. Screen reader users rely on headings for efficient navigation and locating essential sections. When used improperly for styling or layout, headings disrupt the page outline, leading to confusion about the content structure.



ii.  **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii.  **Impact:** Users with visual impairments, particularly those using screen readers, encounter difficulties in understanding the page's structure when headings in the header section are used incorrectly for non-structural purposes. This misuse

19

impedes their ability to navigate effectively and locate important content, undermining the accessibility of the page.

**b.      Action Menu Button and Submenu Not Programmatically Defined**

i. **Issue:** The action menu button lacks proper programmatic definition as a menu button, and the submenu items are not assigned appropriate menu roles. Additionally, users cannot navigate submenu items using arrow keys. Proper menu roles and keyboard support are essential for screen reader and keyboard users to interact with menus. Without these, assistive technologies fail to comprehend the menu structure, obstructing access and navigation of submenu options.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Menu Button Actions

iii. **Impact:** Visually impaired users, especially those using screen readers and keyboards, face significant barriers when attempting to access and interact with the action menu and its submenu. The lack of proper roles and keyboard support prevents these users from efficiently navigating menu options, leading to potential exclusion from critical functionalities.

c. **Header Section Not Programmatically Defined**

i. **Issue:** The page's header section is not defined using a semantic landmark. Typically containing key content like the website name, logo, and primary navigation, the header is crucial for orientation. Screen reader users depend on landmarks to swiftly identify and traverse major page sections. Its absence hinders assistive technologies from recognizing the header's start, complicating navigation.

21



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** Users with visual impairments, especially those using screen readers, experience challenges in identifying and navigating to the header section due to the absence of a semantic landmark. This deficiency impedes their ability to efficiently access important content within the header, such as navigation links and the site logo.

d.     **Footer Section Incorrectly Defined Using Generic Region Role**

i. **Issue:** The footer section is marked with role="region" instead of its correct landmark role. This section often holds vital information like contact details and navigation links. Landmarks aid screen reader users in pinpointing major sections. A generic role prevents assistive technologies from recognizing it as the footer, hindering quick access.



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** Visually impaired users, particularly those utilizing screen readers, face obstacles in locating and navigating to the footer section due to its incorrect generic region role. This issue hampers their ability to quickly access critical footer content, such as contact information or policy links.

e.    **Incorrect Heading Level Used for Section Headings**

i. **Issue:** The headings "Savor Every Moment with Our Timeless Tastes" and "Place Your Order Online" are improperly coded as <h3> instead of <h2>, failing to represent the main sections of the page. Accurate heading hierarchy is essential for screen reader users to grasp page structure and section relationships. Incorrect use disrupts

23

this hierarchy, creating navigation and comprehension issues.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users reliant on screen readers, the incorrect heading levels lead to confusion regarding the page hierarchy and section relationships. This misalignment in the heading structure impedes their ability to understand and efficiently navigate the content, affecting overall accessibility.

f. **Decorative Image Incorrectly Defined with Alternative Text**

i. **Issue:** A decorative image is improperly assigned alternative text, despite its lack of meaningful contribution. Decorative

24

images serve only aesthetic purposes and do not convey content or functionality. Screen reader users depend on alternative text to grasp image purposes. Including alternative text for decorative images causes assistive technologies to relay irrelevant information, leading users to receive extraneous content, thereby complicating effective page navigation.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** Individuals with visual disabilities, particularly those who are blind, experience unnecessary auditory information from screen readers due to decorative images carrying alternative text. This disrupts their ability to efficiently parse page content, as they are subjected to information that lacks significance. Properly marking decorative images with an empty alt attribute ensures screen

25

readers disregard them, thus enhancing the browsing experience by focusing on images that hold informational or functional value.

**g.     Missing "Skip to Content" Link for Keyboard Navigation**

i. **Issue:** The absence of a "Skip to Content" link on the page prevents keyboard users from directly accessing main content, compelling them to navigate through repetitive elements such as navigation menus. This lack of a skip link burdens users with tabbing through multiple navigation items before reaching the primary content.



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users with visual disabilities who depend on screen readers and keyboard navigation, the omission of a "Skip to Content" link significantly hampers their ability to

26

efficiently reach the main content. They must laboriously pass through repetitive navigation links, which can be frustrating and time-consuming. Implementing a visible skip link upon keyboard focus would allow these users to bypass non-essential navigation elements, streamlining access to the main content.

**h.    Same Page Link Does Not Move Focus to Target Content**

i. **Issue:** Activating a same-page link fails to shift keyboard and screen reader focus to the target content, leaving users on the original link. This issue prevents users from recognizing that the page content has changed, hindering their ability to interact with the intended section.



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For individuals who are blind or have visual impairments, the lack of focus movement when activating same-page links is disorienting. It inhibits their awareness of content changes and delays interaction with the new section. Ensuring that focus moves to the target section upon link activation allows assistive technology users to immediately begin engaging with the intended content, improving their navigation experience.

i.    **No Heading Structure Defined on the Page**

i. **Issue:** The page lacks any programmatically defined headings, such as <h1>–<h6>, which are crucial for organizing and structuring content. Screen reader users rely on headings for understanding page layout and navigating between sections efficiently.



28

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** The absence of a defined heading structure negatively affects users with visual disabilities, particularly those using screen readers. Without headings, they cannot discern the content hierarchy or efficiently move between sections, leading to confusion and a disordered browsing experience. Implementing a logical heading structure enables assistive technologies to present a clear page outline, facilitating better navigation and comprehension.

**j.     Accordion Expanded State Not Programmatically Defined**

i. **Issue:** The accordion elements on the page do not have their expanded or collapsed states programmatically defined, leaving screen reader users unaware of the current state of content sections.



ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For visually impaired users, particularly those who are blind, the lack of programmatically defined states in accordion elements is a significant barrier. They cannot determine whether content is expanded or collapsed, resulting in confusion and inefficiency. By employing the aria-expanded attribute, developers can ensure these users receive accurate and timely information about the state of accordion sections, thereby enhancing their browsing experience.

k. **Screen Reader Does Not Announce When Item Is Added to Cart**

i. **Issue:** Upon activating the "Meatballs (3) Three large meatballs with marinara sauce 8.47" button, the item is added to the cart without any programmatic announcement

for screen reader users. While sighted users may notice a visual update in the cart, screen reader users are left without confirmation that the action has been completed.



ii. **WCAG 2.1 AA Violations:** 4.1.3 - AA - Status Messages

iii. **Impact:** The absence of a programmatic announcement when an item is added to the cart prevents screen reader users, particularly those who are blind, from confirming the success of their action. This lack of feedback can lead to confusion and difficulty in managing cart contents. Implementing an ARIA live region that provides an automatic status message will ensure that screen reader users receive immediate and clear confirmation that the item has been added to the cart, aligning their experience more closely with that of sighted users.

51.    Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about March 7, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52.    More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54.    Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing of the barriers to access on March 12, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59.     Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60.     Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61.     MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62.     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

   a.   Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

   b.   Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily

34

accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c.  Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A.  A declaration that Defendant's Website is in violation of the ADA;

B.  An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's

35

Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C.    An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D.    An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E.    An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F.    An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to

36

ensure effective communication for individuals who are visually disabled;

G.    An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.    An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.    An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.    An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a

statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.    An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.    Such other and further relief as the Court deems just and equitable.

Dated: April 27, 2026                    Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**

38